# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v TAYLOR

Docket No. 154994. Argued on application for leave to appeal March 3, 2022. Decided July 28, 2022.

Robert Taylor was convicted following a jury trial in the Macomb Circuit Court of first-degree felony murder, MCL 750.316(1)(b); carjacking, MCL 750.529a; conspiracy to commit carjacking, MCL 750.529a and MCL 750.157a; kidnapping, MCL 750.349; conspiracy to commit kidnapping, MCL 750.349 and MCL 750.157a; and possession of a firearm during the commission of a felony, MCL 750.227b. In 2009, defendant and his codefendant, Ihab Masalmani, abducted Matt Landry from outside a sandwich shop. Defendant acted as the lookout while Masalmani forced Landry into Landry's car. The two then drove Landry away at gunpoint. Defendant and Masalmani held Landry against his will for several hours and stole money from his bank account during that time; Landry was later killed by a gunshot wound to the head. The prosecutor proceeded at trial under the theory that defendant aided and abetted Masalmani in the crimes. The jury found defendant guilty of the charged offenses. The court, Diane M. Druzinski, J., sentenced defendant to a mandatory term of life in prison without the possibility of parole (LWOP) for the felony-murder conviction. In an unpublished per curiam opinion issued on March 21, 2013 (Docket No. 303208), the Court of Appeals, JANSEN, P.J., and FITZGERALD, and K. F. KELLY, JJ., affirmed defendant's convictions but remanded for resentencing in light of the United States Supreme Court's ruling in *Miller v Alabama*, 567 US 460 (2012), which struck down as unconstitutional mandatory LWOP sentences for juveniles. On remand, the prosecutor moved under MCL 769.25—a statute enacted by the Legislature in response to *Miller*—to have defendant resentenced to LWOP. Following a hearing during which the court reviewed the *Miller* factors, the court again sentenced defendant to LWOP. In an unpublished opinion issued September 22, 2016 (Docket No. 325834), the Court of Appeals, BORRELLO, P.J., and MARKEY and RIORDAN, JJ., affirmed defendant's sentence. Defendant sought leave to appeal in the Supreme Court, and his application was held in abeyance at various times pending decisions in *People v Hyatt* 502 Mich 89 (2018); *People v Masalmani* 505 Mich 1090 (2020); and *Jones v Mississippi*, 593 US ___; 141 S Ct 1308 (2021). After those cases were resolved, the Supreme Court ordered and heard oral argument on whether to grant defendant's application for leave to appeal or take other action. 508 Mich 938 (2021).

In an opinion by Justice CAVANAGH, joined by Chief Justice MCCORMACK and Justices BERNSTEIN and WELCH, the Supreme Court, in lieu of granting leave to appeal, *held*:

When a prosecutor seeks to impose LWOP under MCL 769.25 for a crime committed when the defendant was a juvenile, the prosecutor bears the burden to rebut a presumption that LWOP is a disproportionate sentence. The standard for rebuttal is clear and convincing evidence. In this case, defendant was entitled to resentencing because the trial court was not operating within that framework. However, because the Court of Appeals failed to address a separate issue that could be dispositive, the case first had to be remanded to the Court of Appeals for consideration of that issue.

1. The Eighth Amendment of the United States Constitution prohibits cruel and unusual punishments, guaranteeing individuals the right not to be subjected to excessive sanctions. Further, a basic precept of justice requires that punishment be proportionate to both the offense and the offender. The United States Supreme Court has thus held that juvenile offenders are constitutionally different from adult offenders for purposes of sentencing—they are less deserving of the most severe punishments because of their diminished culpability and increased prospects for reform. In *Miller*, therefore, the United States Supreme Court held that the Eighth Amendment prohibits mandatory LWOP sentences for crimes committed when the offender was under 18 years old. *Miller* also set forth factors that a trial court should consider before concluding that it is appropriate to sentence a juvenile offender to die in prison for a homicide offense. Those factors are: (1) the juvenile's chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile's family and home environment; (3) the circumstances of the homicide offense, including the extent of the juvenile's participation in the conduct and the way familial and peer pressures may have affected the juvenile; (4) the incompetencies of youth, which affect whether the juvenile might have been charged with and convicted of a lesser crime, for example, because the juvenile did not have the capacity to assist their attorney in their own defense; and (5) the juvenile's possibility of rehabilitation. These factors have been expressly incorporated into this state's discretionary juvenile LWOP sentencing scheme under MCL 769.25.

2. Under MCL 769.25, if a defendant who was less than 18 years old at the time of their crime is convicted of certain enumerated offenses, including first-degree murder, the prosecutor may file a motion seeking to have the defendant sentenced to LWOP. The motion must specify the grounds on which the prosecutor is requesting that sentence, and the defendant has 14 days to respond. After that, the court must conduct a hearing on the motion during which it must consider the *Miller* factors and may consider any other relevant criteria. Next, the court must specify on the record the aggravating and mitigating circumstances that it considered and the reasons supporting the sentence imposed. If the court decides not to sentence the defendant to LWOP, it must sentence the defendant to a statutory term of years. Although MCL 769.25 does not specify the standard of proof, the burden of proof is generally assigned to the party who seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion. Under MCL 769.25, a sentence of LWOP can be imposed only if the prosecutor files a motion. This motion requirement is meaningful. Under MCL 769.25, the status quo is that a juvenile defendant will be sentenced to a term of years. If the prosecution seeks to change the status quo by filing a motion to impose LWOP, it becomes the moving party and must bear the burden and risk of nonpersuasion at the *Miller* hearing.

3. If the prosecutor seeks to have a juvenile offender sentenced to LWOP pursuant to MCL 769.25, it is the prosecutor's burden to overcome the presumption that LWOP is disproportionate. The most important consideration in the creation of presumptions is probability. A steady line of precedent from the United States Supreme Court could not be clearer—persons under 18, as a group, are less culpable than adults, more prone to outside influence, more likely to be rehabilitated, and less deserving of the most severe punishments. As a procedural mechanism, therefore, it makes sense for sentencing courts to start from the premise that the juvenile defendant before them, like most juveniles, has engaged in criminality because of transient immaturity, not irreparable corruption. In other words, it is probable that the juvenile offender standing before the court possesses those attributes of youth that diminish the penological justifications for imposing the harshest sentences available under Michigan law.

4. The standard of proof serves to allocate the risk of error between litigants and reflects the relative importance attached to a decision. When the Legislature is silent on the standard of proof, the courts must prescribe one. The United States Supreme Court has explained that proof by clear and convincing evidence is appropriate when particularly important individual interests or rights are at stake. Considering the important Eighth Amendment right at stake in comparison to the fact that juvenile LWOP is not categorically barred in Michigan, the prosecutor must prove facts and circumstances that rebut the presumption against LWOP by clear and convincing evidence.

5. The trial court must consider all the evidence before it and determine whether the presumption has been rebutted by clear and convincing evidence in order to impose LWOP. This is an exercise in discretion, not a fact-finding mission. MCL 769.25 does not require the sentencing court to find any particular fact before it can impose LWOP. It is true that in *People v Skinner*, 502 Mich 89 (2018), the Court wrote that neither *Miller* nor *Montgomery* imposes a presumption against LWOP for those juveniles convicted of first-degree murder on either the trial court or the appellate court. But the central holding in *Skinner* was that *Miller* does not require trial courts to make a finding of fact regarding a child's incorrigibility. Whether a presumption against LWOP for juvenile offenders exists was irrelevant to the outcome of the case, so this statement was nonbinding dictum. Moreover, *Skinner* was interpreting what the federal *Constitution* requires while this case concerned what the *statute* requires and how sentencing courts should implement the statute. The decision in this case does not foreclose a sentencing court's ability to sentence a juvenile offender to LWOP if the sentencing court determines that, considering all the information before it, LWOP is a constitutionally proportionate sentence. In this case, defendant was entitled to resentencing because the trial court was not operating within the correct framework for implementing MCL 769.25 when it resentenced defendant.

6. In his Court of Appeals brief, defendant argued that his sentence violated the Eighth Amendment and Article art 1, § 16 of Michigan's Constitution, which prohibits cruel or unusual punishment, because he was convicted of felony murder as an aider and abettor. The Court of Appeals failed to address this issue, so the case had to be remanded to that Court for consideration of that potentially dispositive issue before any resentencing.

Reversed and remanded.

Chief Justice MCCORMACK, joined by Justices BERNSTEIN and CAVANAGH, concurring, wrote separately to explain why she believed the trial court abused its discretion in applying the *Miller* factors when sentencing defendant. The first *Miller* factor requires considering the juvenile offender's chronological age and its hallmark features. These hallmark features include immaturity, impetuosity, and failure to appreciate risks and consequences. Defendant was 16 years and 10 months old at the time of the offense. The trial court noted that the juvenile offenders in *Miller* were roughly two years younger and that defendant's underdeveloped prefrontal cortex would not be much more undeveloped than that of an 18 year old. But a juvenile offender need not be the same age as those in *Miller* to receive the benefit of the *Miller* decision. Proximity to age 18 can affect the *extent* of the mitigation, but proximity to age 18 is emphatically not an aggravating factor. The trial court also concluded that because an 18 year old could not benefit from the brain science presented at the resentencing hearing, neither should a 16-year-old defendant. This was also error. *Miller* requires that juveniles under 18 are to be treated, categorically, as having diminished culpability. That the Eighth Amendment might not require the same for similarly situated 18-year-olds is not constitutionally relevant. The next *Miller* factor is the juvenile's family and home environment. Juveniles subjected to trauma, abuse, and neglect are more vulnerable to outside influences than ordinary teenagers and suffer from cognitive underdevelopment, lack of maturity, and decreased ability to restrain impulses. The trial court here concluded from the evidence that defendant's family environment was "far from optimal" but determined only that this factor "could arguably favor some leniency or lessening of culpability for defendant." Justice MCCORMACK agreed with the trial court that defendant's home environment was "far from optimal" but disagreed that it only *arguably* favored leniency; juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their environment. The third *Miller* factor is the circumstances of the homicide offense, including the extent of the juvenile's participation and the way familial and peer pressures may have affected the juvenile. The trial court found that this factor weighed in favor of LWOP. The court noted that there was no evidence that defendant did not expect the murder to occur, that he attempted to remove himself from the situation, or that he tried to dissuade his codefendant. As much as the trial court believed that defendant's failure to stop his codefendant's conduct, or at least to walk away from it, was evidence against mitigation, *Miller* says otherwise. Juveniles make rash decisions, cannot assess consequences, and are often unable to extricate themselves once criminal situations are set in motion. Finally, the trial court did not address the fact that defendant was convicted of felony murder, not premeditated murder, and as an aider and abettor, not as the principal offender; nor did it address that defendant did not pull the trigger and may not have even been present when the victim was killed. The trial court did not reconcile how both defendant and his older codefendant—who killed the victim—could each be the truly rare juvenile offender deserving of LWOP given their differing conduct. Regarding the next *Miller* factor, the trial court found that there was no evidence that the incapacities of youth hurt defendant's ability to participate in preparing his defense or led him to implicate himself to the authorities. Thus, it found that "this factor favors sentencing defendant to life without the possibility of parole." That is, this factor was aggravating, not mitigating. The trial court's finding was clearly erroneous. *Miller* did not suggest that a juvenile offender is more deserving of LWOP if the offender is better able to participate in their defense. If a defendant's youth hindered their ability to successfully navigate the criminal justice system, that fact is mitigating. If a defendant's youth did not hinder their ability, this factor is neutral. The final *Miller* factor is the possibility of rehabilitation. The trial court found that defendant's "far from optimal" home environment—the only factor that the court found weighed against a sentence of LWOP—also showed that defendant's prospects for

rehabilitation were minimal, supporting LWOP. The court's analysis was backward. Because there was no evidence that defendant could *not* be rehabilitated, there was no reason to conclude that defendant, like the great majority of youths, lacked the capacity to change and mature. Requiring a defendant to prove that they fall into the general category of adolescents would turn *Miller* upside down. The trial court erred by finding that defendant's family environment was mitigating under one *Miller* factor but that the same finding discounted the mitigation of another *Miller* factor. Childhood trauma, neglect, and abuse will always pose a challenge for a juvenile's rehabilitation. But the Supreme Court views a difficult upbringing as a mitigating factor, not as evidence of impossible rehabilitation. The trial court's contrary assessment was error.

Justice VIVIANO, joined by Justices ZAHRA and CLEMENT, dissenting, stated that the majority was using this brutal kidnapping and murder case as an opportunity to drastically limit the discretion sentencing courts have traditionally held to impose a sentence on a defendant convicted of one of our state's most serious crimes. The majority announced a presumption against imposing LWOP on juveniles who commit the crime of murder, ignoring *Skinner*, in which the Court declined to recognize such a presumption only a few years ago. The requirement that the prosecution must file a motion requesting an LWOP sentence is only a condition precedent, not evidence of a presumption. The majority then announced that the prosecution bears the burden of rebutting this presumption, despite the fact that no such burden exists in MCL 769.25. Instead, the statute imposes an unqualified requirement that the trial court consider the *Miller* factors and exercise its discretion to impose either a term-of-years sentence or an LWOP sentence. Justice VIVIANO would have concluded that neither party has the burden of proving to the sentencing court how it should weigh an individual *Miller* factor. From a practical standpoint, a no-burden standard makes good, common sense. The *Miller* factors are not aggravating factors. Therefore, a prosecutor who is seeking an LWOP sentence has no incentive to present evidence regarding the *Miller* factors. It is the defendant who has the incentive to present mitigating evidence. The majority's holding was not supported by the statute and conflicted with caselaw; its rewriting of the statute also raised serious separation-of-powers concerns. Justice VIVIANO would have instead applied the abuse-of-discretion standard and held that the trial court did not abuse its discretion by resentencing defendant to LWOP. The trial court in this case carefully considered and applied each of the *Miller* factors in a lengthy, written opinion, finding that all but defendant's home and family environment favored sentencing defendant to LWOP. It was well within the range of principled outcomes for the trial court to sentence defendant to LWOP. Absent from the majority's opinion was any recognition of the enormous cost the Court imposed on the victim's family and friends by once again requiring them to relive this tragic crime at yet another resentencing, and the Court offered no hope for closure some 13 years after the heinous crime was committed because the trial judge would again have to attempt to fashion a sentence in search of the ever-elusive blessing of the majority. Rather than changing how trial courts sentence juveniles facing LWOP, Justice VIVIANO would have remanded this case to the Court of Appeals for it to address the issue it did not address on direct appeal—whether defendant's sentence violated the Eighth Amendment and Const 1963, art 1, § 16—but he would have otherwise affirmed the Court of Appeals judgment.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 28, 2022

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                     No. 154994

ROBERT TAYLOR,

      Defendant-Appellant.

---

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

This case presents us with a vehicle to provide much-needed guidance to criminal defendants, prosecutors, and trial courts on the proper procedure for conducting MCL 769.25 sentencing hearings when a prosecutor seeks to impose a sentence of life without parole (LWOP) for a crime committed when the defendant was a juvenile. We hold that, as the moving party at a *Miller*[1] hearing, the prosecutor bears the burden to rebut a

---

[1] *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

presumption that LWOP is a disproportionate sentence. The standard for rebuttal is clear and convincing evidence. In this case, the trial court was not operating within the framework we set forth today. Defendant is therefore entitled to resentencing. Because the Court of Appeals failed to address a separate constitutional issue that could be dispositive, however, we remand this case to the Court of Appeals to consider that issue in the first instance before any resentencing can take place.

## I. FACTS AND PROCEDURAL HISTORY

There is no denying that the facts of this case are heinous. The victim, Matt Landry, was brazenly abducted in broad daylight from outside an Eastpointe sandwich shop by defendant, Robert Taylor, and codefendant, Ihab Masalmani. Armed with a gun, defendant, who was 16 years old at the time, acted as a lookout while 17-year-old Masalmani forced Landry into Landry's own car; the two then drove Landry away at gunpoint. The pair held Landry captive over the next several hours, drove his vehicle around, and stole money from his bank account. Eventually, while continuing to hold Landry captive, the pair made their way into the city of Detroit to purchase crack cocaine. The victim was last seen alive inside a vacant drug house. A few days later, Landry's body was discovered inside a burned-out house in Detroit. He had been shot in the back of the head, execution style.[2]

---

[2] Following trial, Masalmani admitted responsibility for Landry's murder and indicated that defendant was not present when he was killed.

2

Defendant and Masalmani were arrested and tried before separate juries in connection with these criminal actions.[3] The prosecutor's theory at trial was that defendant aided and abetted Masalmani. Following trial, a jury convicted defendant of first-degree felony murder, MCL 750.316(1)(b); carjacking, MCL 750.529a; conspiracy to commit carjacking, MCL 750.529a and MCL 750.157a; kidnapping, MCL 750.349; conspiracy to commit kidnapping, MCL 750.349 and MCL 750.157a; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant received the mandatory sentence of LWOP for his first-degree murder conviction. On appeal, the Court of Appeals affirmed in an unpublished per curiam opinion.[4] However, in light of the then-recent United States Supreme Court case, *Miller v Alabama*, 567 US 460; 132 S Ct 2455;

---

[3] For his part in the above-described crimes, Masalmani was convicted of first-degree felony murder, carjacking, conspiracy to commit carjacking, kidnapping, conspiracy to commit kidnapping, larceny from a person, and possession of a firearm during the commission of a felony (felony-firearm). *People v Masalmani*, unpublished per curiam opinion of the Court of Appeals, issued March 19, 2013 (Docket Nos. 301376; 301377; 301378), p 1. In addition to the kidnapping and murder of Matt Landry, however, Masalmani continued on a lone crime spree, resulting in the initiation of two additional criminal cases. *Id*. at 1-2. One of the cases involved two counts of armed robbery, one count each of kidnapping and bank robbery, and four counts of felony-firearm. *Id*. The other involved carjacking, receiving or concealing a firearm, and felony-firearm. *Id*. at 2. Masalmani's three criminal cases were consolidated for trial. *Id*. at 1. Because defendant did not participate in the acts giving rise to the second and third criminal cases, his charges pertaining to the kidnapping and murder of Matt Landry were severed from Masalmani's and tried before a separate jury.

[4] *People v Taylor*, unpublished per curiam opinion of the Court of Appeals, issued March 21, 2013 (Docket No. 303208), pp 1, 8.

183 L Ed 2d 407 (2012), which struck down mandatory LWOP sentences for juveniles, the Court of Appeals vacated his sentence and remanded for resentencing.[5]

As will be discussed in greater detail, in response to *Miller*, the Michigan Legislature enacted MCL 769.25.[6] In accordance with that statute, the prosecutor moved to have defendant sentenced to LWOP. MCL 769.25(2). As required by MCL 769.25(6), the trial court held a *Miller* hearing over the course of two days in October 2014. The trial court heard testimony from Kathleen Schaefer, a licensed professional counselor and associate professor qualified as an expert in parole and probation. Schaefer had met with defendant in prison and expressed a belief that defendant was capable of change and rehabilitation, although she admitted there was no predictive "test" that could indicate whether a person was capable of rehabilitation or not. The parties also stipulated to the admission of the report and testimony of Dr. Daniel Keating, a professor of psychology, psychiatry, and pediatrics, who was qualified as an expert in cognitive brain development in adolescents.[7] Keating's testimony concerned scientific generalizations surrounding adolescent brain development. Following the hearing, the trial court took the matter under advisement.

---

[5] *Id*. at 7-8. Codefendant Masalmani's case was also remanded for resentencing for the same reason. *Masalmani*, unpub op at 7.

[6] The Legislature correspondingly enacted MCL 769.25a, creating a resentencing procedure in response to *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016), which held that *Miller* was to be applied retroactively. Because defendant's case was still on direct appeal, MCL 769.25 is the relevant provision in this case.

[7] Keating testified before the same judge at codefendant Masalmani's *Miller* hearing two days before defendant's *Miller* hearing. He did not personally meet with either juvenile.

4

On January 6, 2015, the trial court issued an order and opinion sentencing defendant to LWOP. In its opinion, the trial court went through each *Miller* factor and determined that LWOP was an appropriate sentence, characterizing defendant as a " 'rare juvenile offender whose crime reflects irreparable corruption.' " (Citation omitted.) Defendant again sought leave to appeal, and the Court of Appeals again affirmed in an unpublished per curiam opinion. *People v Taylor*, unpublished per curiam opinion of the Court of Appeals, issued September 22, 2016 (Docket No. 325834) (hereinafter, "*Taylor*, unpub op"). Defendant sought leave to appeal in this Court, and the application was held in abeyance multiple times while this Court and the United States Supreme Court continued to refine the contours of juvenile LWOP sentencing jurisprudence.[8] After the resolution of those cases, this Court ordered oral argument on the application in defendant's case, directing the parties to address

> whether, in exercising its discretion to impose a sentence of life without
> parole (LWOP), the trial court properly considered the "factors listed in
> *Miller v Alabama*, [567 US 460] (2012)" as potentially mitigating
> circumstances. MCL 769.25(6). See also *People v Skinner*, 502 Mich 89,
> 113-116 (2018). In particular, the parties shall address: (1) which party, if
> any, bears the burden of proof of showing that a *Miller* factor does or does
> not suggest a LWOP sentence; (2) whether the sentencing court gave proper

[8] This case was first held in abeyance, *People v Taylor*, 893 NW2d 610 (2017), for *People v Hyatt*, 502 Mich 89; 917 NW2d 292 (2018) (holding that a sentence imposed under MCL 769.25 is not subject to a heightened standard of review). *Hyatt* was considered alongside *People v Skinner*, 502 Mich 89; 917 NW2d 292 (2018) (holding that MCL 769.25 does not require a judge to find any particular fact before imposing LWOP). Defendant's case was held in abeyance again after this Court granted leave to appeal in codefendant Masalmani's case. *People v Taylor*, 924 NW2d 592 (2019). The Court later vacated the grant order in that case over a dissent from Chief Justice MCCORMACK. *People v Masalmani*, 505 Mich 1090 (2020). Last, we held defendant's case in abeyance while the Supreme Court considered *Jones v Mississippi*, 593 US ___; 141 S Ct 1307; 209 L Ed 2d 390 (2021). *People v Taylor*, 949 NW2d 454 (2020).

5

consideration to the defendant's "chronological age and its hallmark features," *Miller*, 567 US at 477-478, by focusing on his proximity to the bright line age of 18 rather than his individual characteristics; and (3) whether the court properly considered the defendant's family and home environment, which the court characterized as "far from optimal," as weighing against his potential for rehabilitation. [*People v Taylor*, 508 Mich 938 (2021) (alteration in original).]

## II. LEGAL LANDSCAPE

The Eighth Amendment of the United States Constitution prohibits "cruel and unusual punishments." US Const, Am VIII.[9] This amendment " 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller*, 567 US at 469, quoting *Roper v Simmons*, 543 US 551, 560; 125 S Ct 1183; 161 L Ed 2d 1 (2005). A "basic precept of justice" requires that punishment must be proportionate to both the offense and the offender. *Miller*, 567 US at 469 (quotation marks and citation omitted).

"[C]hildren are constitutionally different from adults for purposes of sentencing." *Id*. at 471. In general, juveniles are less deserving of the most severe punishments because of their diminished culpability and increased prospects for reform. *Id*. Juveniles lack maturity, possess an underdeveloped sense of responsibility, are more vulnerable to negative outside influence, have limited control over their own environment, and have transitory personality traits. *Id*. For these reasons and others, the Supreme Court held in

---

[9] We note that the Michigan Constitution prohibits "cruel *or* unusual punishment." Const 1963, art 1, § 16 (emphasis added). Article 1, § 16 is thus interpreted more broadly than the Eighth Amendment. *People v Bullock*, 440 Mich 15, 30; 485 NW2d 866 (1992); *People v Parks*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 162086); slip op at 10; *People v Stovall*, ___ Mich ___, ___; ___NW2d ___ (2022) (Docket No. 162425); slip op at 7. Defendant's original application for leave to appeal in this Court did not raise an argument under this provision, nor did we ask the parties to address state constitutional principles. We therefore decline to address whether defendant's sentence violates Const 1963, art 1, § 16.

6

*Roper*, 543 US at 578, that the Eighth Amendment bars capital punishment for offenders who were under the age of 18 when they committed their crimes and held in *Graham v Florida*, 560 US 48, 82; 130 S Ct 2011; 176 L Ed 2d 825 (2010), that the Eighth Amendment prohibits the sentence of LWOP for juveniles who commit nonhomicide offenses. The Supreme Court later summarized:

> *Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because the heart of the retribution rationale relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult. Nor can deterrence do the work in this context, because the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. Similarly, incapacitation could not support the life-without-parole sentence in *Graham* [because] [d]eciding that a juvenile offender forever will be a danger to society would require making a judgment that he is incorrigible— but incorrigibility is inconsistent with youth. And for the same reason, rehabilitation could not justify that sentence. Life without parole forswears altogether the rehabilitative ideal. It reflects an irrevocable judgment about an offender's value and place in society, at odds with a child's capacity for change. [*Miller*, 567 US at 472-473 (quotation marks, citations, and brackets omitted).]

Next came *Miller*, 567 US 460, in which the Supreme Court held that the Eighth Amendment prohibits mandatory LWOP sentences for crimes committed when the offender was under 18 years old. Mandatory LWOP penalty schemes "preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id*. at 476. This "poses too great a risk of disproportionate punishment." *Id*. at 479. "[I]n imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult." *Id*. at 477.

The Supreme Court set forth circumstances that a trial court should consider before concluding that it is appropriate to sentence a juvenile offender to die in prison. *Id*. at 477-478. Those "*Miller* factors" are: (1) the juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the juvenile's family and home environment—"from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) "the incompetencies of youth," which affect whether the juvenile might have been charged with and convicted of a lesser crime, for example, because the juvenile was unable to deal with law enforcement or prosecutors or because the juvenile did not have the capacity to assist their attorney in their own defense; and (5) the juvenile's "possibility of rehabilitation." *Id*. These factors have been expressly incorporated into this state's discretionary juvenile LWOP sentencing scheme. MCL 769.25(6).

While the Supreme Court declined to categorically ban juvenile LWOP sentences for homicide convictions, it reasoned that the "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Miller*, 567 US at 479. "That is especially so because of the great difficulty . . . of distinguishing at this early stage between the 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " *Id*. at 479-480, quoting *Roper*, 543 US at 773, and citing *Graham*, 560 US at 68.

A few years later, the Supreme Court held that *Miller* would be applied retroactively. *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599

8

(2016). In that case, the Supreme Court reiterated that, while *Miller* did not foreclose a sentencer's ability to sentence a juvenile to LWOP, "a lifetime in prison is a disproportionate sentence for all but the rarest of children" and is reserved for those "whose crimes reflect irreparable corruption." *Id*. at 195 (quotation marks and citations omitted). Most recently, in *Jones v Mississippi*, 593 US ___; 141 S Ct 1307; 209 L Ed 2d 390 (2021), the Supreme Court concluded that a factual finding of permanent incorrigibility was not constitutionally required before imposing an LWOP sentence on a juvenile offender. *Id*. at ___, ___; 141 S Ct at 1314, 1319. Even so, that decision "carefully follow[ed] both *Miller* and *Montgomery*" and reconfirmed that juvenile LWOP should be "relatively rare." *Id*. at ___, ___; 141 S Ct at 1318, 1321.

As for this Court's relevant precedent, in *People v Skinner*, 502 Mich 89; 917 NW2d 292 (2018), we considered whether MCL 769.25 was unconstitutional under the Sixth Amendment of the United States Constitution. We held that MCL 769.25 did not violate the Sixth Amendment because the statute did not require a judge to find any particular fact before imposing LWOP. *Id*. at 97. The Court further recognized that, under *Miller*, the Eighth Amendment does not require a sentencer to make a finding of "irreparable corruption" before imposing an LWOP sentence. *Id*. at 120. The subsequent *Jones* decision confirmed that this was an accurate statement of law. *Jones*, 593 US at ___; 141 S Ct at 1318-1319 ("[T]he Court has unequivocally stated that a separate factual finding of permanent incorrigibility is not required before a sentencer imposes [an LWOP] sentence on a murderer under 18.").

9

This Court reviews de novo questions of constitutional law. *People v Hughes*, 506 Mich 512, 522; 958 NW2d 98 (2020). A trial court's decision to sentence a juvenile to LWOP is reviewed for an abuse of discretion. *Skinner*, 502 Mich at 131-132. A sentencing court's underlying factual findings in support of a sentence are reviewed for clear error. *Id*. at 137 n 27.

*Miller*'s substantive holding is that LWOP is an excessive sentence for children whose crimes reflect transient immaturity. *Montgomery*, 577 US at 210. In *Montgomery*, the Supreme Court acknowledged that the procedures necessary to implement that substantive guarantee are left to the states. *Id*. at 211 ("[T]his Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems."). Although *Jones* held that all that was required is a discretionary sentencing procedure, it also noted that its holding did "not preclude the States from imposing additional sentencing limits in cases involving defendants under 18 convicted of murder." *Jones*, 593 US at ___; 141 S Ct at 1323. The Michigan Legislature has imposed additional sentencing limits via MCL 769.25. It is this Court's duty to "determine and effectuate the intent of the Legislature through reasonable construction in consideration of the purpose of the statute and the object to be accomplished,"[10] *Gross v Gen Motors Corp*, 448 Mich 147, 158-159; 528 NW2d 707 (1995), and it is also our duty to ensure that sentencing judges have the tools to "determine

---

[10] MCL 769.25 was enacted in direct response to the Supreme Court's *Miller* decision. We have no reason, therefore, to believe that our Legislature intended anything antithetical to the principles set forth in *Miller*.

the proper sentence in individual cases in light of the facts and circumstances of the offense," *Jones*, 593 US at ___; 141 S Ct at 1322.[11]  With these principles in mind, today we clarify the procedural mechanisms necessary for applying MCL 769.25 that are consistent with the statutory language, the constitutional background giving rise to that statute, and standard motion practice in Michigan.  Specifically, we hold that there is a rebuttable presumption against the imposition of juvenile LWOP sentences in Michigan and that it is the prosecution's burden to overcome this presumption by clear and convincing evidence at a *Miller* hearing.

It is helpful to start with an overview of MCL 769.25, the statute our Legislature enacted to remedy the constitutional defect present in sentencing schemes that allow for mandatory juvenile LWOP sentences.  Under that statute, if a defendant who was less than 18 years old at the time of their crime is convicted of certain enumerated offenses, including first-degree murder, the prosecutor may file a motion seeking to have the juvenile sentenced to LWOP.[12]  The motion "shall specify the grounds on which the prosecuting attorney is requesting the court to impose a sentence of imprisonment for life without the possibility of parole."  MCL 769.25(3).  The defendant has 14 days to respond.  MCL

---

[11] We are also empowered by Const 1963, art 6, § 5 to "establish, modify, amend, and simplify the practice and procedure in all courts of this state."  This is generally accomplished by the issuance of administrative orders and the promulgation of court rules.  This Court also, however, sometimes develops procedural rules through case law.  See, e.g., *People v Killebrew*, 416 Mich 189, 194; 330 NW2d 834 (1982); *People v Cobbs*, 443 Mich 276, 283; 505 NW2d 208 (1993).  That said, we need not invoke that constitutional power here when our decision simply seeks to interpret the necessary procedural mechanisms inherent to the function of MCL 769.25.

[12] If no motion is filed within the prescribed period, the defendant must be sentenced to a term of years as governed by the statute.  MCL 769.25(4).

11

769.25(5). After that, the court must conduct a hearing on the motion during which it must consider the *Miller* factors and may consider any other relevant criteria. MCL 769.25(6). Next, the court must "specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed." MCL 769.25(7). If the court decides not to sentence the defendant to LWOP, it must sentence the defendant to a statutory term of years. MCL 769.25(9).

The question of who bears the burden at a *Miller* hearing is relatively straightforward.[13] Although MCL 769.25 does not include a specified standard of proof, the burden of proof[14] is generally assigned to the party who "seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion." 2 McCormick, Evidence (8th ed), § 337, p 696. This concept—that the moving party bears the burden—is uniformly present in Michigan practice and procedure in both criminal and civil contexts. See, e.g., *People v Denson*, 500 Mich 385,

---

[13] The *Skinner* Court stated that "there is language in *Montgomery* that suggests that the juvenile offender bears the burden of showing that life without parole is not the appropriate sentence by introducing mitigating evidence." *Skinner*, 502 Mich at 131. We believe this dictum is a misreading of the *Montgomery* decision, which concerned the retroactive application of *Miller*. That juvenile defendants entitled to resentencing "must be given the opportunity to show their crime did not reflect irreparable corruption," *Montgomery*, 577 US at 213, simply indicates that those who had already served time in prison for the offense should be able to present to the resentencing court any relevant mitigating evidence accumulated since their original sentencing. We do not view this language from *Montgomery* as a pronouncement that a defendant bears the ultimate burden at a *Miller* hearing. In any event, the statement in *Skinner* was dictum and involved an interpretation solely of the constitutional requirements under *Montgomery*; it did not involve procedural mechanisms attached to a legislative sentencing scheme.

[14] The term "burden of proof" encompasses two separate burdens: the burden of producing evidence and the burden of persuading the trier of fact. 2 McCormick, Evidence (8th ed), § 336, p 692.

12

398; 902 NW2d 306 (2017) (noting that the prosecution bears the burden of establishing a proper purpose when seeking to introduce other-acts evidence); *Detroit Fire Fighters Ass'n, IAFF Local 344 v Detroit*, 482 Mich 18, 34; 753 NW2d 579 (2008) (recognizing that the burden of proof rests on the party seeking a preliminary injunction); *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604, 609; 566 NW2d 571 (1997) (stating that the burden of supporting its position is on the party moving to show summary disposition is appropriate); *People v Maranian*, 359 Mich 361, 368; 102 NW2d 568 (1960) (explaining that the burden of showing the necessity of requested discovery "rests upon the moving party"); *People v Van Camp*, 356 Mich 593, 602-603; 97 NW2d 726 (1959) (noting that the burden is on the movant of a motion in a criminal proceeding). Nothing in MCL 769.25 suggests a deviation from this standard practice. See *Malone v Lambrecht*, 305 Mich 58, 61-62; 8 NW2d 910 (1943) (noting that if the Legislature had intended to depart from a long-established construction, it "seems certain that it would have expressed such intention in clear and definite terms").[15]

Pursuant to the statutory scheme created by the Legislature, if the prosecutor does not seek LWOP for a juvenile defendant convicted of one of the enumerated offenses in MCL 769.25(2), then the default sentence is a term of years. MCL 769.25(4).[16] The

_____

[15] In a footnote, the *Skinner* Court suggested that the Legislature's failure to specify a burden of proof supported that the statute did not require any particular finding of fact. *Skinner*, 502 Mich at 118 n 13. We agree with the *Skinner* Court that no particular finding of fact is required under the Eighth Amendment, as affirmed in *Jones*, but its further statement about the burden of proof is dictum because it was unnecessary to the resolution of the case. See *People v Peltola*, 489 Mich 174, 190 n 32; 803 NW2d 140 (2011).

[16] *People v Boykin*, ___ Mich ___, ___ n 4; ___ NW2d ___ (2022) (Docket No. 157738); slip op at 8 n 4 ("The trial court possesses no authority to sentence a juvenile defendant to

Legislature could have simply made the *Miller* hearing the next step in the criminal proceeding. See, e.g., NC Gen Stat 15A-1340.19B. But, under our statutory scheme, a sentence of LWOP can be imposed only if the prosecutor files a motion. This motion requirement is meaningful. Under MCL 769.25, the status quo is that a juvenile defendant will be sentenced to a term of years; however, if the prosecution seeks to change the status quo by filing a motion to impose LWOP, it becomes the moving party that must bear the burden and risk of nonpersuasion at the *Miller* hearing.[17]

A few additional points are worth making. First, a *Miller* hearing is not comparable to an ordinary sentencing hearing in which neither the prosecutor nor the defendant generally bears any particular burden.[18] A *Miller* hearing has unique constitutional implications beyond those present at other sentencing hearings because it necessarily involves defendants who commit crimes when they are juveniles—individuals who are "constitutionally different" from their adult counterparts for purposes of sentencing.

---

life without parole unless the prosecution first moves for that sentence and the proper hearing is conducted.").

[17] We agree with the dissent that the neither the prosecution nor the juvenile defendant bear any particular burden with respect to each individual *Miller* factor. Under MCL 769.25, the *Miller* factors are simply to be "considered" and the trial court is to make pertinent findings of fact, but there is no burden of proof associated with those particular considerations.

[18] We have not traditionally viewed sentencing within any pronounced burden-shifting framework. In some instances, however, sentencing proceedings do have assigned burdens. For example, the prosecution bears the burden of establishing that challenged facts in the presentence report are accurate and bears the burden of establishing aggravating facts. See *People v Norfleet*, 317 Mich App 649, 669; 897 NW2d 195 (2016). The prosecution also bears the burden of establishing the proper amount of restitution when the amount is contested. *People v Gahan*, 456 Mich 264, 276; 571 NW2d 503 (1997), overruled on other grounds *People v McKinley*, 496 Mich 410 (2014).

*Miller*, 567 US at 471. Second, unlike a typical sentencing, a *Miller* hearing is not a natural progression of a criminal proceeding because the prosecutor must file a motion to change the status quo posttrial. Third, to conclude that neither party bears the burden, as the prosecution argues, would allow LWOP to be the default sentence, which would run contrary to Supreme Court precedent[19] and the framework adopted by our Legislature under MCL 769.25. Finally, a no-burden standard is unworkable as it leaves a juvenile defendant to the whims of individual sentencing courts, instead of promoting uniformity and fairness. See McCormick, § 336, p 694 (explaining that a possible risk posed by not allocating a burden is that a court might assign its own burden "describing that burden as it saw fit by substituting its own notions of policy"). This is particularly troublesome in a *Miller* hearing—when the trial court is faced with imposing the harshest possible punishment under Michigan law on some of the potentially least culpable offenders.

Because the prosecution bears the burden of proof as to the imposition of LWOP, the question becomes what does the prosecution need to prove or demonstrate in its role as the movant at a *Miller* hearing? *Skinner* and *Jones* make clear that, for Eighth Amendment purposes, MCL 769.25 does not require the trial court to make any particular finding of fact before the court can impose LWOP. *Skinner*, 502 Mich at 114; *Jones*, 593 US at ___; 141 S Ct at 1319. We do not deviate from that holding, and we do not suggest that there is one particular fact that a prosecutor must prove to establish that LWOP is appropriate. For example, the prosecutor need not prove that the defendant is "permanently incorrigible" or "irreparably corrupt." That said, the Legislature has created a scheme in

---

[19] *Miller*, 567 US at 479 ("[W]e think appropriate occasions for sentencing juveniles to this harshest possibly penalty will be uncommon.").

15

which the prosecutor is the moving party, and as the bearer of the burden, the prosecutor must prove something.

In this regard, we hold that if the prosecutor seeks to have a juvenile offender sentenced to LWOP pursuant to MCL 769.25, it is the prosecutor's burden to overcome the presumption that LWOP is disproportionate. "[A] presumption is a standardized practice, under which certain facts are held to call for uniform treatment with respect to their effect as proof of other facts." McCormick, § 342, p 724. "[T]he most important consideration in the creation of presumptions is probability." *Id*. at § 343, p 731. A steady line of precedent from the Supreme Court could not be clearer—persons under 18,[20] *as a group*, are less culpable than adults, more prone to outside influence, and more likely to be rehabilitated. For these reasons and others, juveniles are "less deserving of the most severe punishments." *Miller*, 567 US at 471 (quotation marks and citation omitted). This is why the Supreme Court has, for example, *categorically* banned certain punishments for defendants under 18 and why *all* juvenile offenders are entitled to a discretionary sentencing procedure when it comes to LWOP sentencing. As a procedural mechanism, therefore, it makes sense for sentencing courts to start from the premise that the juvenile defendant before them, like most juveniles, has engaged in criminality because of transient immaturity, not irreparable corruption. In other words, it is likely that the juvenile offender standing before the court possesses those attributes of youth that diminish the penological justifications for imposing the harshest sentences available under Michigan law.

---

[20] This Court has decided to extend that reasoning to 18-year-olds under state constitutional principles. See *Parks*, ___ Mich ___.

16

Again, MCL 769.25 does not require the sentencing court to find a *particular fact* before it can impose an LWOP sentence. *Skinner*, 502 Mich at 97. That the court need not make any particular finding of fact, however, does not relieve the prosecutor of the burden of demonstrating facts that support their extraordinary request to sentence a juvenile defendant to LWOP. In doing so, the prosecutor must prove facts and circumstances that rebut the presumption against LWOP by the well-known standard of clear and convincing evidence.[21] The trial court, in turn, must consider all the evidence before it and determine whether the presumption has been rebutted in order to impose LWOP.[22] This is an exercise in discretion, not a fact-finding mission. See *Skinner*, 502 Mich at 116 n 11 ("Those terms—consider, justify, outweigh—reflect a process of assigning weights to competing interests, and then determining . . . which of those interests predominates."), quoting *United States v Gabrion*, 719 F3d 511, 532 (CA 6, 2013).

These procedural mechanisms do not run afoul of *Skinner* or *Jones*. It is true that in *Skinner* this Court wrote that "neither *Miller* nor *Montgomery* imposes a presumption *against* life without parole for those juveniles who have been convicted of first-degree

---

[21] The standard of proof serves to allocate the risk of error between litigants and reflects the relative importance attached to a decision. *Addington v Texas*, 441 US 418, 423; 99 S Ct 1804; 60 L Ed 2d 323 (1979). When the Legislature is silent on the standard of proof, the courts must prescribe one. *Herman & MacLean v Huddleston*, 459 US 375, 389; 103 S Ct 683; 74 L Ed 2d 548 (1983). The Supreme Court has explained that proof by clear and convincing evidence is appropriate when "particularly important individual interests or rights are at stake." *Id*. Considering the important Eighth Amendment right at stake in comparison to the fact that juvenile LWOP is not categorically barred in Michigan, we conclude that this standard of proof strikes the correct balance.

[22] Even if the presumption has been rebutted, the trial court is not obligated to impose LWOP.

17

murder on either the trial court or the appellate court." *Skinner*, 502 Mich at 131.[23] But the central holding in *Skinner* was that "*Miller* does not require trial courts to make a finding of fact regarding a child's incorrigibility." *Id*. at 122. Whether a presumption against LWOP for juvenile offenders exists was irrelevant to the outcome of the case, and so this statement was nonbinding dictum. See *People v Peltola*, 489 Mich 174, 190 n 32; 803 NW2d 140 (2011) ("Obiter dicta are not binding precedent. Instead, they are statements that are unnecessary to determine the case at hand and, thus, lack the force of an adjudication.") (quotation marks and citation omitted). Moreover, *Skinner* was interpreting what the federal *Constitution* requires while our decision today is about what the *statute* requires and how this Court can help guide trial courts in implementing the statute. In addition, the fact that *Miller* and *Montgomery* did not patently provide a presumption against LWOP is not dispositive. As the Supreme Court remarked in *Montgomery*, when a new substantive rule of constitutional law is established, the Supreme Court is "careful to limit the scope of any attendant procedural requirement to avoid

---

[23] The dissent contends that *Skinner* actually "rejected the very presumption" that we have created today. In support, it notes that in *Skinner*'s companion case, *People v Hyatt*, 316 Mich App 368, 425-426; 891 NW2d 549 (2016), reversed in part by *Skinner*, 502 Mich 89 (2018), the Court of Appeals stated, "[w]hile we do not suggest a presumption against the constitutionality of [juvenile LWOP], we would be remiss not to note that review of that sentence requires a searching inquiry into the record with the understanding that, more likely than not, a[n] [LWOP] sentence imposed on a juvenile is disproportionate." Despite the panel's caveat, the *Skinner* Court concluded that this statement sounded "tantamount to a presumption against" LWOP and implicitly rejected it. *Skinner*, 502 Mich at 128-129. This presumption-sounding statement in *Hyatt*, however, was made in the context of the Court of Appeals' conclusion that juvenile LWOP sentences were subject to a heightened standard of review. *Hyatt*, 316 Mich App 422-427. In other words, upon closer review, the presumption that the dissent believes the *Skinner* Court rejected from *Hyatt* was an appellate presumption, not the type of presumption we find inherent in MCL 769.25.

18

intruding more than necessary upon the State's sovereign administration of their criminal justice systems." *Montgomery*, 577 US at 211.[24]  Finally, while the *Jones* Court rejected that a separate factual finding of incorrigibility was a constitutionally required means to implement *Miller*, it in no way walked back the primary essence of that decision—that a juvenile LWOP sentence should remain "relatively rare." *Jones*, 593 US at ___, ___; 141 S Ct at 1318, 1321 ("The Court's decision today carefully follows both *Miller* and *Montgomery*.").

As in *Miller*, our decision today does not foreclose a sentencing court's ability to sentence a juvenile offender to LWOP if it is determined that, considering all the information before it, LWOP is a constitutionally proportionate sentence. *Miller*, 467 US at 489.

## IV.  CONCLUSION

Our decision today seeks to provide guidance and ensure uniformity in the procedures used by sentencing courts when facing the monumental responsibility of balancing the lessened culpability of juveniles and their capacity for change and rehabilitation with their often abhorrent criminal actions.  It also intends to ensure that a juvenile defendant's substantive Eighth Amendment right against receiving an excessive sentence remains safeguarded by our Legislature's statutory scheme.  Accordingly, we hold that MCL 769.25 expressly requires that the prosecutor play the role of moving party and that, therefore, the prosecutor bears the burden of proof at a *Miller* hearing.  That burden

---

[24] For this reason, while an explicit presumption is not present in *Miller* or *Montgomery*, we reject the dissent's allegation that our interpretation of MCL 769.25 as necessarily including one constitutes "contorted logic."

19

is to rebut a presumption that the particular juvenile defendant is not deserving of LWOP. If the prosecutor cannot shoulder this burden by clear and convincing evidence, the trial court must sentence the defendant to a term of years. With this guidance on practice and procedure,[25] it is our sincere hope that Michigan's discretionary sentencing scheme, MCL 769.25, can live up to the Supreme Court's philosophy that a discretionary sentencing procedure will ensure that juvenile LWOP remains relatively rare. *Jones*, 593 US at ___; 141 S Ct at 1318.

Before the trial court can implement these procedures, however, the Court of Appeals must address an issue raised by defendant in his appeal of right. In his Court of Appeals brief, defendant argued that his LWOP sentence violates the Eighth Amendment and Const 1963, art 1, § 16 because he was convicted of felony murder as an aider and abettor. The panel failed to address this issue, so we remand to that Court for consideration of defendant's argument. We do not retain jurisdiction.

Megan K. Cavanagh
Bridget M. McCormack
Richard H. Bernstein
Elizabeth M. Welch

---

[25] Because defendant is entitled to resentencing, we do not discuss the specifics of the trial court's use of the *Miller* factors. We take this opportunity, however, to reiterate that it is "undisputed that all of [the *Miller* factors] are mitigating factors." *Skinner*, 502 Mich at 115. If a particular *Miller* factor does not militate against LWOP, for example, at most that factor will be considered neutral. See *Masalmani*, 505 Mich at 1090, 1090 (MCCORMACK, C.J., dissenting). Here, for example, it appears that at times the trial court suggested that some of the *Miller* factors—such as defendant's chronological age and proximity to age 18 or the dearth of evidence indicating that the incompetencies of youth hindered his ability to navigate the criminal justice system—*favored* LWOP. We caution the trial courts to ensure that the *Miller* factors are not used as aggravators.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                    No. 154994

ROBERT TAYLOR,

       Defendant-Appellant.

_____

MCCORMACK, C.J. (*concurring*).

I concur fully with the majority opinion. I write separately to explain, as I did in *People v Masalmani*, 505 Mich 1090 (2020) (MCCORMACK, C.J., dissenting), why I believe the trial court abused its discretion in applying the factors from *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), when sentencing the defendant, Robert Taylor. As the majority explains, those factors are (1) the juvenile's chronological age and its hallmark features, including immaturity, impetuosity, and failure to appreciate risks and consequences, (2) the juvenile's family and home environment, (3) the circumstances of the homicide offense, including the extent of his participation and the way familial and peer pressures may have affected him, (4) "the incompetencies of youth," and (5) the juvenile's possibility of rehabilitation. *Id*. at 477-478.

## I. CHRONOLOGICAL AGE AND ITS HALLMARK FEATURES

The first *Miller* factor requires considering the juvenile defendant's "chronological age and its hallmark features . . . ." *Id*. at 477. These hallmark features include

"immaturity, impetuosity, and failure to appreciate risks and consequences." *Id*. Most juveniles possess these characteristics. *Id*. at 471 (noting that it was "common sense" and that " 'any parent knows' " that children possess these characteristics) (citation omitted); *Eddings v Oklahoma*, 455 US 104, 116; 102 S Ct 869; 71 L Ed 2d 1 (1982) ("Even the normal 16-year-old customarily lacks the maturity of an adult.").

The defendant was 16 years and 10 months old at the time of the offense. The trial court found noteworthy that although he was 10 months younger than his codefendant, Ihab Masalmani, the defendant was "still much older than the 14-year old [sic] defendants in *Miller*." As to the "hallmark features" of youth, the trial court acknowledged that the defendant presented an expert, Dr. Daniel P. Keating, who testified that an adolescent's limbic system, "which serves as an arousal system, . . . an incentive system, and a reward system" is more active than an adult's. The expert also explained that the prefrontal cortex is supposed to work as a "brake on the [limbic] system but it develops much more slowly than the limbic system." There is thus a "developmental maturity mismatch" between the two systems in adolescents. As a result, Keating explained, teenagers tend to engage in reckless behavior.

But the trial court found that the defendant's age and its hallmark features did not "significantly mitigate defendant's culpability." The court believed that the defendant was readily distinguishable from the *Miller* defendants because those defendants were roughly two years younger. Although Keating stated that the prefrontal cortex remains undeveloped, the court reasoned that because it was "not free to take this developmental disconnect into consideration when a criminal is over 18," and this defendant was only 14 months shy of 18, his developmental disconnect was "not much more pronounced than that

of an 18 year old." Ultimately, the court was "not convinced that this factor mitigates against a sentence of life without the possibility of parole" (LWOP).

The Court of Appeals agreed with the trial court's consideration of this first factor. *People v Taylor*, unpublished per curiam opinion of the Court of Appeals, issued September 22, 2016 (Docket No. 325834); slip op at 3-4. For the panel, the defendant's age was "in marked contrast to the 14-year-old defendants in *Miller*[.]" *Id*. And it concluded that the record refuted "any claim that the hallmark features of adolescence identified in *Miller* . . . played any role in defendant's crimes." *Id*. at 4. Unlike in *Miller*, this case did not involve a botched robbery[1] but brazen criminal action over a long period. *Id*. To the panel, this demonstrated that the crime was "not reflective of a merely immature or impetuous adolescent who fails to appreciate risks and consequences." *Id*. Finally, the panel concluded that Keating's testimony had "minimal bearing" because he did not personally meet or interview the defendant and his testimony only addressed "generic brain science." *Id*.

I am not persuaded by either court's reasoning. A juvenile defendant need not be the same age as the petitioners from *Miller* to receive the benefit of the *Miller* decision. The Supreme Court drew the line at 18, not 14. Proximity to age 18 can affect the *extent*

---

[1] This is not accurate. While one of the juvenile petitioners (Kuntrell Jackson) was convicted of murder stemming from a spur-of-the-moment botched robbery, the other juvenile petitioner (Evan Miller) engaged in a botched robbery *and* other criminal actions over a long period, including murder and arson. *Miller*, 567 US at 465-466, 467-468. More importantly, the criminal conduct need not match that in *Miller*'s holding because the *Miller* rule is not offense-specific. "[N]one of what is said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific." *Id*. at 473.

of the mitigation; the Supreme Court suggested as much. *Miller*, 567 US at 476-477 (explaining that one of the flaws of mandatory LWOP is that it mandates the same sentence for "the 17-year-old and the 14-year-old"); *id*. at 480 n 8 ("Our holding requires factfinders . . . to take into account the differences among defendants . . . ."). But that is the question: how does a juvenile's age affect the extent of mitigation? Proximity to age 18 is emphatically not an aggravating factor.

The trial court also concluded—despite the brain science presented—that because an 18 year old could not benefit from consideration of that information, neither should a 16-year-old defendant. This was also error. As I have stated, "*Miller* did not suggest that 18-year-olds are, as a class, equipped with the decision-making faculties that 17-year-olds lack. Nor did *Miller* suggest that a sentencer should disregard the expanding body of scientific knowledge on adolescent brain development merely because an older offender who, although developmentally similar, may be subject to mandatory LWOP sentencing." *Masalmani*, 505 Mich at 1093 (MCCORMACK, C.J., dissenting).

In other words, *Miller* requires that juveniles under 18 are to be treated, categorically, as having diminished culpability. That the Eighth Amendment might not require the same for similarly situated 18-year-olds is not constitutionally relevant. It is not a juvenile defendant's burden to prove that they were especially immature, impetuous, or risk-seeking. *Miller* requires that we start from the premise that every youthful offender possesses these characteristics. Moreover, the Court of Appeals' view that Keating's testimony was only minimally relevant because he did not personally interview the defendant turns the starting presumption upside down. Rather, Keating's testimony reflects the starting presumption that LWOP is not appropriate.

## II. FAMILY AND HOME ENVIRONMENT

The next *Miller* factor is the juvenile's home and family environment. *Miller*, 567 US at 477. Juveniles subjected to trauma, abuse, and neglect are more vulnerable to outside influences than ordinary teenagers and suffer from cognitive underdevelopment, lack of maturity, and decreased ability to restrain impulses. Equal Justice Initiative, *Cruel and Unusual: Sentencing 13- and 14-year-old Children to Die in Prison* (January 2008), p 18, available at <https://eji.org/wp-content/uploads/2019/10/cruel-and-unusual.pdf> (accessed June 8, 2022) [https://perma.cc/Z9MW-KCS2]. One of the *Miller* petitioners was physically abused and neglected by addict parents, in and out of foster care, and struggled with mental health issues, *Miller*, 567 US at 479, and the other petitioner came from a background of violence, *id*. at 478.

The trial court here recognized the defendant's difficult home and family environment. He was born to a teenaged mother and grew up in an unstable and unsafe environment; there was an active child protective case open on the family from the time the defendant was 6 years old. He was neglected and subjected to violence and substance abuse. His father, who was addicted to alcohol and cocaine, was not present. More than once, the defendant and his siblings did not have adequate food and shelter.

The trial court concluded from this evidence that the defendant's family environment was "far from optimal" but determined only that this factor "*could arguably* favor some leniency or lessening of culpability for defendant." (Emphasis added.) The Court of Appeals affirmed: "In light of these far from optimal circumstances, the trial court properly weighed this factor in favor of defendant and against a life without parole sentence." *Taylor*, unpub op at 4.

I agree with the trial court that the defendant's home environment was "far from optimal" but disagree it only *arguably* favors leniency. As the Supreme Court has said, "vulnerability and comparative lack of control over their immediate surroundings mean[s] juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." *Roper v Simmons*, 543 US 551, 570; 125 S Ct 1183; 161 L Ed 2d 1 (2005).

III. CIRCUMSTANCES OF THE OFFENSE

The third *Miller* factor is the "circumstances of the homicide offense, including the extent of [the juvenile's] participation in the conduct and the way familial and peer pressures may have affected him." *Miller*, 567 US at 477. Because one of the *Miller* petitioners did not fire the bullet that killed the victim, had not intended her death, and was convicted as an aider and abettor, *id*. at 478, these circumstances were part of the calculus of determining the defendant's culpability, *id*.

In this case, the trial court recounted the grim details of the victim's abduction and death and acknowledged that it was the codefendant who shot the victim. And although the defendant's expert, Kathleen Schaefer, testified that "peer pressure is an issue for children," the court determined that no specific evidence or testimony tied the defendant's criminal activity to "direct peer or family pressure." Thus, the trial court found that this factor "weighs in favor of finding that defendant's sentence of life without the possibility of parole is appropriate." The court was persuaded that because the defendant drove the victim around for hours and "facilitated his murder in cold blood . . . his actions were still quite culpable" given that there was no evidence that he did not expect the murder to occur,

6

that he attempted to remove himself from the situation, or that he tried to dissuade his codefendant. According to the trial court, there was therefore nothing in the facts that would warrant anything less than LWOP.

The Court of Appeals agreed. *Taylor*, unpub op at 4-5. The panel reasoned that there is no categorical bar on LWOP for a juvenile convicted of felony murder on an aiding-and-abetting theory. *Id*. And given the substantial evidence that the defendant participated in the crime, "[t]he evidence supports the conclusion that defendant was actively and extensively involved in committing the crimes, and there is no indication that defendant was subjected to any family or peer pressure." *Id*.

As much as the trial court or the Court of Appeals believed that the defendant's failure to stop his codefendant's conduct, or at least to walk away from it, was evidence against mitigation, *Miller* says otherwise. Juveniles make rash decisions, cannot assess consequences, and are often unable to extricate themselves once criminal situations are set in motion. *Id*. at 478 (noting that the petitioner's age "could well have affected his calculation of the risk . . . , as well as his willingness to walk away at that point").

Finally, the trial court did not address the fact that the defendant was convicted of felony murder, not premeditated murder, and as an aider and abettor, not as the principal offender; nor did it address that the defendant did not pull the trigger and may not have even been present when the victim was killed. See *Graham v Florida*, 560 US 48, 69; 130 S Ct 2011; 176 L Ed 2d 825 (2010) (noting that a juvenile offender who does not kill or have an intent to kill has "a twice diminished moral culpability" as "compared to an adult murderer"). The trial court did not reconcile how both the defendant and his older codefendant—who killed the victim—can each be the truly "rare juvenile offender" given

7

their different respective conduct. *Miller*, 567 US at 479-480 (quotation marks and citation omitted).

## IV. INCOMPETENCIES OF YOUTH

The next *Miller* factor instructs trial courts to consider "the incompetencies associated with youth," *id*. at 477-478, because "[t]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings," *Graham*, 560 US at 78. For example, juveniles might be unable to deal with police officers or prosecutors or help their attorneys mount a defense, leading to charges and convictions of greater offenses than an adult more capable of navigating the criminal justice system. *Miller*, 567 US at 477-478.

The trial court found that there was no evidence that the incapacities of youth hurt the defendant's ability to participate in preparing his defense or led him to implicate himself to the authorities. Thus, it found that "this factor *favors* sentencing defendant to life without the possibility of parole." (Emphasis added.) The Court of Appeals seems to have recast the trial court's work: the panel held that "[t]his factor . . . did not weigh *in favor of mitigation*." *Taylor*, unpub op at 6 (emphasis added).

But the trial court found that this factor "favor[ed] sentencing defendant to life without the possibility of parole." That is, this factor was aggravating, not mitigating. The trial court's finding was clearly erroneous. "*Miller* did not suggest that a juvenile offender is more deserving of LWOP if the offender is better able to participate in their defense . . . ." *Masalmani*, 505 Mich at 1094 (MCCORMACK, C.J., dissenting). If a defendant's youth hindered their ability to successfully navigate the criminal justice system, that fact is mitigating. If a defendant's youth did not hinder their ability, this factor is neutral.

8

## V. POSSIBILITY OF REHABILIATION

The final *Miller* factor is the possibility of rehabilitation. Permanent incorrigibility "is inconsistent with youth." *Miller*, 567 US at 473 (quotation marks and citations omitted). Few juveniles are truly incorrigible, and "many . . . have the capacity for change." *Graham*, 560 US at 77. While a trial court might "encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and [LWOP] is justified," this will be uncommon because of "children's diminished culpability and heightened capacity for change[.]" *Montgomery v Louisiana*, 577 US 190, 208; 136 S Ct 718; 193 L Ed 2d 599 (2016) (quotations marks and citation omitted).

The trial court found that the defendant's "far from optimal" home environment—the only factor the court found weighed against a sentence of LWOP—also showed that the defendant's prospects for rehabilitation were minimal, supporting LWOP. The court was persuaded that because no evidence showed rehabilitation, or that the defendant had accepted responsibility for his part in the offense, "that defendant's prospects for rehabilitation are negligible." As a result, the court reasoned that "this factor favors a sentence of life without the possibility of parole."

The Court of Appeals agreed with the trial court that the defendant's difficult upbringing "weighed in his favor" but also "[i]ndicated that he faces significant challenges in improving himself[.]" And, like the trial court, because there was no evidence that he had "accepted responsibility or shown genuine remorse for his crimes," there was no reason "to conclude that he has made any substantial progress in rehabilitating himself . . . ." *Taylor*, unpub op at 6. There was also not "any discernable basis to conclude that he is likely to do so in the future." *Id*.

9

This gets the analysis exactly backward. Because there was no evidence that the defendant could *not* be rehabilitated, there is no reason to conclude that the defendant, like the great majority of youths, lacks the capacity to change and mature, as the Supreme Court has consistently made plain. *Miller*, 567 US at 479. Requiring the defendant to prove that he falls into the general category of adolescents turns *Miller* upside down.

An escalating propensity for crime is relevant, to be sure. But " 'only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood.' " *Roper*, 543 US at 570, quoting Steinberg & Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am Psychologist 1009, 1014 (2003). That is, juvenile criminal behavior does not inevitably predict adult criminal behavior. A lack of remorse is also relevant. The question is not whether the defendant was rehabilitated in 2014, but whether he could be rehabilitated within a statutory term of years—which can be up to 60.

Even more to the point, the trial court erred by finding that the defendant's family environment is mitigating under one *Miller* factor but that the same finding discounts the mitigation of another *Miller* factor. Childhood trauma, neglect, and abuse will always pose a challenge for a juvenile's rehabilitation. But the Supreme Court views a difficult upbringing as a mitigating factor, not as evidence of impossible rehabilitation. The trial court's contrary assessment was error.

Bridget M. McCormack
Richard H. Bernstein
Megan K. Cavanagh

10

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                          No. 154994

ROBERT TAYLOR,

      Defendant-Appellant.

_____

VIVIANO, J. (*concurring in part and dissenting in part*).

The majority uses this brutal kidnapping and murder case as an opportunity to drastically limit the discretion sentencing courts have traditionally held to impose a sentence on a defendant convicted of one of our state's most serious crimes. It announces a presumption against imposing a sentence of life without parole (LWOP) on juveniles who commit the crime of murder, ignoring our precedent that declined to recognize such a presumption only a few years ago. The majority then announces that the prosecution bears the burden of rebutting this presumption, despite the fact that no such burden exists in MCL 769.25, the statute that instructs courts when they may sentence a juvenile to LWOP. The majority's holding finds no support in the statute and conflicts with our caselaw, and its rewriting of the statute raises serious separation-of-powers concerns. Rather than attempting to micromanage how our trial court judges make sentencing decisions, I would apply the time-honored abuse-of-discretion standard consistent with our caselaw and hold

that the learned trial judge did not abuse her discretion in resentencing defendant to LWOP.[1]

## I. FACTS AND PROCEDURAL HISTORY

On August 9, 2009, defendant, Robert Taylor, who was then nearly 17 years old, helped his 17-year-old codefendant, Ihab Masalmani, brutally assault, kidnap, and murder a 21-year-old man in a random act of violence that began as a carjacking outside a sandwich shop on a Sunday afternoon. Defendant participated in the kidnapping as a lookout and by helping his codefendant get the victim into the car. Once inside the car, Masalmani and defendant showed the victim the gun and told him "what time it was," meaning that they intended to shoot him or beat him up. After Masalmani used the victim's ATM card to withdraw money, defendant and Masalmani took the victim to an abandoned house in Detroit, where Masalmani later shot the victim in the back of the head, killing him execution style. Defendant disposed of the murder weapon by selling it to someone on the street. Defendant was convicted by a jury of several offenses, the most serious of which was first-degree felony murder, MCL 750.316(1)(b). The trial court sentenced defendant to a mandatory term of LWOP for the felony-murder conviction.

After defendant was convicted but before he had filed his direct appeal, the United States Supreme Court decided *Miller v Alabama*, which held that mandatory LWOP for those under the age of 18 at the time of their crime is unconstitutional.[2] Our Legislature

---

[1] I take no issue with the majority's remand to the Court of Appeals for it to address the issue that it did not address on direct appeal.

[2] *Miller v Alabama*, 567 US 460, 479; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

subsequently enacted MCL 769.25 and MCL 769.25a, which establish procedures for sentencing juvenile defendants and resentencing defendants in light of *Miller*, respectively. On direct appeal in this case, the Court of Appeals remanding affirmed defendant's convictions but remanded for resentencing under *Miller* and MCL 769.25.[3]

A three-day resentencing hearing was held in 2014, at which there was testimony relating to both defendant and Masalmani. The trial court issued a written opinion, resentencing defendant to LWOP. The trial judge considered the five *Miller* factors and found that all of them except for defendant's home and family environment favored an LWOP sentence. First, the court looked at defendant's age and the "hallmark features" of it, noting that defendant was 16 years and 10 months old when he committed his crime, which was younger than Masalmani but older than the defendants in *Miller*, who were 14. The court noted that defendant was closer to 18 than the *Miller* defendants and reasoned that defendant's proximity to his 18th birthday suggested that the developmental disconnect between the parts of his brain would not be much more pronounced than that of an 18-year-old. Second, the court found "that defendant's family and home environment were very far from optimal." Third, the court looked at the circumstances of the offense, finding no evidence that peer pressure played a role. The court also found there to be no evidence that defendant did not expect the murder to occur. Fourth, the trial court found no evidence that the incapacities of youth prevented defendant from participating in his defense. Finally, the court opined that defendant's traumatic childhood reduced his

---

[3] *People v Taylor*, unpublished per curiam opinion of the Court of Appeals, issued March 21, 2013 (Docket No. 303208), pp 1, 7-8.

likelihood of rehabilitation; it also found no evidence suggesting that defendant had shown signs of rehabilitation to date.

Defendant appealed, and the Court of Appeals affirmed the sentence in an unpublished per curiam opinion, concluding that the sentencing judge did not abuse her discretion.[4] Defendant sought leave to appeal in this Court. We held the case in abeyance for a number of cases, most recently *Jones v Mississippi*, in which the Supreme Court granted certiorari to consider whether the Eighth Amendment requires the sentencing authority to make a finding that a juvenile is permanently incorrigible before imposing an LWOP sentence.[5] After *Jones* was decided, we ordered oral argument on the application in this case, directing the parties to brief

> whether, in exercising its discretion to impose a sentence of life without parole (LWOP), the trial court properly considered the "factors listed in *Miller v Alabama*, [567 US 460] (2012)" as potentially mitigating circumstances. MCL 769.25(6). See also *People v Skinner*, 502 Mich 89, 113-116 (2018). In particular, the parties shall address: (1) which party, if any, bears the burden of proof of showing that a *Miller* factor does or does not suggest a LWOP sentence; (2) whether the sentencing court gave proper consideration to the defendant's "chronological age and its hallmark features," *Miller*, 567 US at 477-478, by focusing on his proximity to the bright line age of 18 rather than his individual characteristics; and (3) whether the court properly considered the defendant's family and home environment, which the court characterized as "far from optimal," as weighing against his potential for rehabilitation.[6]

---

[4] *People v Taylor*, unpublished per curiam opinion of the Court of Appeals, issued September 22, 2016 (Docket No. 325834).

[5] *Jones v Mississippi*, 589 US ___; 140 S Ct 1293 (2020).

[6] *People v Taylor*, 508 Mich 938 (2021) (alteration in original).

## II. LEGAL BACKGROUND

The Eighth Amendment of the United States Constitution states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[7] Pursuant to this constitutional provision, the United States Supreme Court has limited the potential punishments available for juvenile offenders over the past twenty years. First, in *Roper v Simmons*, the United States Supreme Court held that imposing the death penalty on individuals for crimes committed under the age of 18 violates the Eighth and Fourteenth Amendments.[8] Next, in *Graham v Florida*, the Court held that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."[9]

Finally, in *Miller v Alabama*, the Supreme Court held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."[10] In so holding, the Court relied on *Roper* and *Graham*, explaining:

> *Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform . . . they are less deserving of the most severe punishments. Those cases relied on three significant gaps between juveniles and adults. First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures including from their family and peers; they have limited control over their own environment and lack the ability to

---

[7] US Const, Am VIII.

[8] *Roper v Simmons*, 543 US 551, 560-579; 125 S Ct 1183; 161 L Ed 2d 1 (2005).

[9] *Graham v Florida*, 560 US 48, 82; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

[10] *Miller*, 567 US at 479.

extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.[11]

The Court further explained that mandatory LWOP

> prevent[s] the sentencer from taking account of these central considerations. By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children.[12]

The Court highlighted five factors that a mandatory LWOP statute prevents the sentencer from considering:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him— and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. . . . And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.[13]

---

[11] *Id*. at 471 (cleaned up).

[12] *Id*. at 474.

[13] *Id*. at 477-478.

6

The defendants in *Miller* had argued that the Eighth Amendment requires a categorical bar on LWOP being imposed on juveniles.[14]  The Court found it unnecessary to address this issue and declined to impose such a categorical bar but observed:

> [W]e think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.  That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."[15]

The Court did not foreclose the sentencer's ability to make that judgment in homicide cases but did require the sentencer "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."[16]

In response to *Miller*, our Legislature enacted MCL 769.25 and MCL 769.25a, which establish the procedures for when the prosecution seeks LWOP at sentencing or for the resentencing of a juvenile defendant.[17]  Under these statutes, a trial court must sentence a defendant to a term of years if the prosecution does not file a motion to sentence the defendant to LWOP.[18]  If the prosecution intends to seek an LWOP sentence, it must file a motion that "specif[ies] the grounds on which the prosecuting attorney is requesting the

---

[14] *Id*. at 479.

[15] *Id*. at 479-480, quoting *Roper*, 543 US at 573.

[16] *Miller*, 567 US at 480.

[17] MCL 769.25a established a procedure for resentencing in the event *Miller* was given retroactive effect and is not relevant to this case.

[18] MCL 769.25(4).

court to impose a sentence of imprisonment for life without the possibility of parole."[19] The trial court is then required to conduct a hearing on the motion, at which it must consider the *Miller* factors and "may consider any other criteria relevant to its decision, including the individual's record while incarcerated."[20]

A few years later, the Supreme Court gave *Miller* retroactive effect.[21] In doing so, the Court explained that "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility," but the lack of such a fact-finding requirement "speaks only to the degree of procedure *Miller* mandated in order to implement its substantive guarantee."[22] "That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment."[23]

We subsequently considered a constitutional challenge to MCL 769.25 in *People v Skinner*.[24] There, we held "that MCL 769.25 does not violate the Sixth Amendment because neither the statute nor the Eighth Amendment requires a judge to find any particular fact before imposing life without parole; instead, life without parole is authorized

---

[19] MCL 769.25(3).

[20] MCL 769.25(6).

[21] See *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016).

[22] *Id*. at 211.

[23] *Id*.

[24] *People v Skinner*, 502 Mich 89; 917 NW2d 292 (2018).

8

by the jury's verdict alone."[25]  Central to the holding was the fact that the *Miller* factors, which the trial court must consider during sentencing pursuant to MCL 769.25(6), are mitigating factors.[26]  Because the Sixth Amendment only prohibits fact-finding that increases a sentence, considering the *Miller* factors in a way that reduces a sentence does not violate the Sixth Amendment.[27]  We noted that although MCL 769.25(7) "requires the trial court to 'specify on the record the aggravating and mitigating circumstances considered by the trial court,' that does not necessarily mean that the trial court must specify an aggravating circumstance before it can impose a life-without-parole sentence upon a juvenile."[28]  Instead, it means "that if the trial court *does* consider any aggravating (or mitigating) circumstances, it must specify those circumstances on the record."[29]  We also rejected a presumption against LWOP sentences, noting that "neither *Miller* nor *Montgomery* imposes a presumption *against* life without parole for those juveniles who have been convicted of first-degree murder on either the trial court or the appellate court."[30]  Finally, we concluded that "[t]he trial court remains in the best position to determine whether each particular defendant is deserving of life without parole."[31]

---

[25] *Id*. at 97.

[26] *Id*. at 115.

[27] *Id*. at 115-116.

[28] *Id*. at 117 n 12.

[29] *Id*.

[30] *Id*. at 128, 131.

[31] *Id*. at 137.

Most recently, in *Jones,* the United States Supreme Court considered whether the Eighth Amendment requires the sentencing authority to make a finding that a juvenile is permanently incorrigible before imposing an LWOP sentence.[32] The Court rejected the defendant's argument "that a sentencer who imposes a life-without-parole sentence must *also* make a separate factual finding that the defendant is permanently incorrigible, or at least provide an on-the-record sentencing explanation with an implicit finding that the defendant is permanently incorrigible."[33] That argument was "inconsistent with the Court's precedents" because *Miller* requires "only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing" LWOP and *Montgomery* "flatly stated that '*Miller* did not impose a formal factfinding requirement' and added that 'a finding of fact regarding a child's incorrigibility . . . is not required.' "[34] The Court noted that, just as in *Miller* and *Montgomery,* its holding "does not preclude the States from imposing additional sentencing limits in cases involving defendants under 18 convicted of murder."[35]

---

[32] *Jones v Mississippi*, 593 US ___; 141 S Ct 1307; 209 L Ed 390 (2021).

[33] *Id*. at ___; 141 S Ct at 1311.

[34] *Id*. at ___; 141 S Ct at 1311, quoting *Miller*, 567 US at 483, and *Montgomery*, 577 US at 190, 211.

[35] *Jones*, 593 US at ___: 141 S Ct at 1323.

III. THE MAJORITY'S PRESUMPTION THAT LWOP IS A DISPROPORTIONATE SENTENCE FOR JUVENILE DEFENDANTS IS NOT SUPPORTED BY THE STATUTE OR CASELAW

The majority declares that there is a presumption that LWOP is a disproportionate sentence for juveniles. It justifies the creation of such a presumption on *Miller*'s observation that, as a group, juveniles are "less deserving of the most severe punishments."[36] But in *Skinner*, we rejected the very presumption the majority creates today. In the companion case to *Skinner*, *People v Hyatt*, the Court of Appeals had stated, "While we do not suggest a presumption against the constitutionality of that sentence, we would be remiss not to note that review of that sentence requires a searching inquiry into the record with the understanding that, more likely than not, a life-without-parole sentence imposed on a juvenile is disproportionate."[37] In *Skinner*, we rejected this approach, explaining that "this sounds tantamount to a presumption against life-without-parole sentences."[38] We further observed that "neither *Miller* nor *Montgomery* imposes a presumption *against* life without parole for those juveniles who have been convicted of first-degree murder on either the trial court or the appellate court."[39]

The majority contends that *Skinner* is not binding precedent on this issue, characterizing as dicta our statement that "neither *Miller* nor *Montgomery* imposes a

[36] *Miller*, 567 US at 471 (quotation marks and citation omitted).

[37] *People v Hyatt*, 316 Mich App 368, 425-426; 891 NW2d 549 (2016), aff'd in part and rev'd in part sub nom *Skinner*, 502 Mich 89.

[38] *Skinner*, 502 Mich at 128.

[39] *Id*. at 131.

presumption *against* life without parole for those juveniles who have been convicted of first-degree murder on either the trial court or the appellate court."[40]  But the majority's focus on this statement in *Skinner* is a red herring.  As the majority itself acknowledges, this statement was accurate with respect to what *Miller* and *Montgomery* said.[41]  More significantly, as noted above, *Skinner* specifically rejected *Hyatt*'s creation of a presumption against LWOP for juveniles.[42]  Indeed, the dissent in *Skinner* believed that *Miller* and *Montgomery* require a presumption against LWOP for juveniles and concluded that our interpretation of MCL 769.25 violated *Miller* because it did "not allow for such a presumption."[43]  And in the dissent in *People v Masalmani*, three members of the majority in the present case indicated their belief that the lack of a presumption against LWOP in *Miller* and *Montgomery* was an integral part to our rationale in *Skinner*.[44]  Thus, the

_____

[40] *Id*.

[41] See *ante* at 18 (acknowledging "that *Miller* and *Montgomery* did not patently provide a presumption against LWOP").

[42] *Skinner*, 502 Mich at 128.

[43] *Id*. at 150 (MCCORMACK, J., dissenting).

[44] See *People v Masalmani*, 505 Mich 1090, 1092 (2020) (MCCORMACK, C.J., dissenting) ("This Court avoided the Sixth Amendment issue and held that MCL 769.25 does not require a trial court to make *any* additional findings (beyond the offender's guilt) before sentencing a juvenile offender to LWOP.  *Skinner*, 502 Mich at 117-119 (opinion of the Court).  That is, there is no judicial fact-finding problem, because there is no fact-finding requirement.  The Court reasoned that such a result is consistent with *Miller* (and *Montgomery v Louisiana*, 577 US 190 (2016)), because those decisions do not impose a presumption against LWOP for juvenile offenders.  *Skinner*, 502 Mich at 131.").

majority is simply incorrect when it asserts that the presumption it announces today does not run afoul of *Skinner*.[45]

It is true, as the majority observes, that *Skinner* considered what was constitutionally required and not whether MCL 769.25 created a presumption against LWOP. But MCL 769.25 was in effect when *Skinner* was decided, and nothing in the language of the statute indicates that such a presumption exists. Indeed, MCL 769.25(6) contains an express reference to the *Miller* factors, but—as already noted—neither *Miller* nor *Montgomery* contain a presumption against LWOP for juvenile offenders. If the Legislature had intended to create a presumption against LWOP not found in *Miller* at the time it incorporated the *Miller* factors in MCL 769.25, one would think it would have expressly done so. By conjuring an extrastatutory presumption against LWOP for juveniles as part of the procedure the Legislature created when it enacted MCL 769.25, the majority violates the omitted-case canon of statutory interpretation.[46]    Apparently, according to the

---

[45] The majority attempts to distinguish *Skinner* by noting that *Hyatt* had imposed a heightened standard of review on LWOP sentences that were appealed, while contending that in this case it is simply finding a presumption against LWOP inherent in MCL 769.25. But the heightened standard of review that *Hyatt* imposed was inextricably linked with what the panel in that case believed was also required of trial courts. Prior to stating that an appellate court was required to conduct a "searching inquiry into the record with the understanding that, more likely than not, a life-without-parole sentence imposed on a juvenile is disproportionate," *Hyatt*, 316 Mich App 426, the Court stated that "trial courts must operate with the understanding that, more likely than not, a life-without-parole sentence is disproportionate for the juvenile offender being sentenced," *id*. at 421. Furthermore, an appellate presumption against LWOP without a corresponding presumption in the trial court would make no sense. If a presumption were to exist only at the appellate level, it would be the action of filing an appeal, rather than the sentence to LWOP itself, that created a presumption that the sentence is unconstitutional.

[46] See Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 93 ("Nothing is to be added to what the text states or reasonably

13

majority's contorted logic, while it rejects any notion "that our Legislature intended anything antithetical to the principles set forth in *Miller*" when it adopted MCL 769.25, somehow the majority has discovered an extratextual presumption in the statute not found in *Miller* or *Montgomery*. The majority's creation of an extrastatutory presumption also raises serious separation-of-powers concerns. To the extent the presumption essentially supplements the statute, it is akin to an amendment of the statute, which is clearly beyond judicial power.[47]

Finally, the mere fact that a trial court is prohibited from imposing an LWOP sentence unless the prosecution files a motion requesting that sentence does not mean that there is a presumption against an LWOP sentence once the prosecution has filed the motion. As discussed below, the requirement that the prosecution must file a motion requesting an LWOP sentence is only a condition precedent, not evidence of a presumption. Rather than adopt an extrastatutory presumption against LWOP for juveniles, I would simply require that the trial court apply the *Miller* factors as mandated by *Miller* and MCL 769.25(6).

---

implies (*casus omissus pro omisso habendus est*). That is, a matter not covered is to be treated as not covered.") (emphasis omitted).

[47] See *People v Harris*, 499 Mich 332, 356; 885 NW2d 832 (2016) ("It is not our role to rewrite the law or substitute our own policy judgment in the face of the text of the statute . . . ."); see also *People v Parks*, ___ Mich ___, ___; ___ NW2d ___ (CLEMENT, J., dissenting); slip op at 14-19.

14

## IV. NEITHER PARTY SHOULD BEAR THE BURDEN OF PROOF WITH RESPECT TO THE INDIVIDUAL *MILLER* FACTORS

The majority does not stop at creating a presumption against LWOP for juveniles. It also declares that the prosecution has the burden to overcome this presumption by clear and convincing evidence. Again, no such requirement is found in MCL 769.25, which raises the same interpretive and separation-of-powers concerns already discussed.

Although trial courts generally have "broad discretion in imposing a sentence within a statutory range,"[48] our Legislature has chosen to limit this otherwise broad discretion by enacting MCL 769.25. Indeed, a trial court has no authority to sentence a juvenile homicide offender to LWOP if the prosecutor does not file a motion requesting it to do so.[49] It is only after the prosecutor files such a motion that the trial court has the discretion to sentence a juvenile to LWOP. This does not mean, however, that the prosecution bears the burden of proof with respect to the individual *Miller* factors. As we stated in *Skinner*, "a trial court's decision to impose life without parole after considering the mitigating and aggravating circumstances is not a factual finding, but a moral judgment."[50] The *Miller* factors are undisputedly mitigating circumstances and, therefore, may weigh against the imposition of an LWOP sentence. But that determination is within the discretion of the trial court, not a fact to be proven or disproven by the parties.

---

[48] *United States v Booker*, 543 US 220, 233; 125 S Ct 738; 160 L Ed 2d 621 (2005).

[49] MCL 769.25(4).

[50] *Skinner*, 502 Mich at 116 n 11.

15

The United States Supreme Court has come to a similar conclusion in the context of the death penalty.[51]  At issue there was a state sentencing procedure that required the jury to consider aggravating and mitigating circumstances and determine whether the aggravating circumstances outweighed the mitigating circumstances such that the death penalty should be imposed.[52]  The United States Supreme Court has expressed doubt that it is "even possible to apply a standard of proof to the mitigating-factor determination" in a death penalty sentencing proceeding.[53]  "Whether mitigation exists . . . is largely a judgment call . . . ."[54]  The Court continued, "It *would* be possible, of course, to instruct the jury that *the facts establishing* mitigating circumstances need only be proved by a preponderance, leaving the judgment whether those facts are indeed mitigating, and whether they outweigh the aggravators, to the jury's discretion without a standard of proof."[55]  Indeed, this is what the federal government has done in 18 USC 3593(c): "The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information."  But our Legislature did not do so in MCL 769.25.  MCL 769.25(6) contains no language regarding a burden and instead imposes an unqualified requirement that the trial court must consider the *Miller* factors and exercise its discretion to impose either a

---

[51] See *Kansas v Carr*, 577 US 108; 136 S Ct 633; 193 L Ed 2d 535 (2016).

[52] *State v Carr*, 300 Kan 1, 308; 331 P3d 544 (2014).

[53] *Carr*, 577 US at 119.

[54] *Id*.

[55] *Id*.

term-of-years sentence or an LWOP sentence. Therefore, I would conclude that neither party has the burden of proving to the sentencing court how it should weigh an individual *Miller* factor.

From a practical standpoint, far from being "unworkable," a no-burden standard makes good, common sense. The *Miller* factors are not aggravating factors.[56] Therefore, a prosecutor who is seeking an LWOP sentence has no incentive to present evidence regarding the *Miller* factors. It is the defendant who has the incentive to present mitigating

---

[56] See *Skinner*, 502 Mich at 114-116. Because the *Miller* factors are not aggravating, a no-burden standard would not be unconstitutional. LaFave, Israel, King & Kerr explain in their seminal treatise *Criminal Procedure*:

> If a fact functions as an element of an aggravated offense, [then] the defendant has the right to demand proof of its existence beyond a reasonable doubt before a jury. If not, and the fact is merely a sentencing factor, proof before a judge by a lower standard will suffice. [6 LaFave et al, Criminal Procedure (4th ed), § 26.4(h), p 1007.]

Because placing the burden of proving mitigating factors beyond a preponderance of the evidence in capital cases on the defendant has been found not to violate due process, "due process would permit legislatures to place upon the defendant the burden of proving mitigating factors in noncapital cases as well." *Id*. at § 26.4(h), p 1010, citing *Walton v Arizona*, 497 US 639; 110 S Ct 3047; 111 L Ed 2d 511 (1990). Only a plurality in *Walton* agreed that placing the burden of proving mitigating factors on the defendant was constitutionally permitted. *Walton*, 497 US at 650-651 (opinion by White, J.). *Walton* was overruled on other grounds with respect to its holding, *id*. at 647-649 (opinion of the Court), that a judge, rather than a jury, could make a finding of aggravating factors to justify the imposition of the death penalty. *Ring v Arizona*, 536 US 584; 122 S Ct 2428; 153 L Ed 2d 556 (2002). But the Court later relied on *Walton* to uphold Kansas's statute that placed the burden of proving mitigating factors on the defendant. *Kansas v Marsh*, 548 US 163, 169-173; 126 S Ct 2516; 165 L Ed 2d 429 (2006). In *Walton* the Arizona legislature had incorporated the preponderance-of-the-evidence standard directly into its death penalty statutes, requiring that the defendant prove by that standard the existence of mitigating circumstances. See *Walton*, 497 US at 649; Arizona Rev Stat Ann 13-703(C) and (E) (1989). But, again, MCL 769.25 contains no express burden of proof.

evidence.[57]  But, again, MCL 769.25(6) requires the trial court to consider the *Miller*

factors regardless of whether the defendant specifically argues that a given *Miller* factor

weighs in his favor or not.[58]

---

[57] In *Skinner*, we observed that "there is language in *Montgomery* that suggests that the juvenile offender bears the burden of showing that life without parole is not the appropriate sentence by introducing mitigating evidence." *Skinner*, 502 Mich at 131.  To the extent that this was simply a recognition of the reality that a defendant will have an incentive to introduce mitigating evidence, I agree with this observation.  But to the extent that this portion of *Skinner* could be interpreted as imposing a legal burden on a defendant to introduce mitigating evidence, I would question such an interpretation of *Montgomery*. *Skinner* cited the portion of *Montgomery* that said that "prisoners . . . must be given the opportunity to show their crime did not reflect irreparable corruption . . . ." *Montgomery*, 577 US at 213.  But requiring that an opportunity be given to make an argument or introduce evidence does not shift the burden.  For example, a defendant has the right to present evidence during a trial.  *Washington v Texas*, 388 US 14, 19; 87 S Ct 1920; 18 L Ed 2d 1019 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law.").  But that does not shift the burden of proof at a criminal trial.  Likewise, it would be wrong to conclude that *Montgomery*'s statement that prisoners must be given the opportunity to show that their crime does not warrant LWOP places a legal burden on the defendant in a *Miller* hearing.

[58] Of course, this entire analysis changes if a presumption against LWOP is imposed.  At that point, the prosecution has an incentive to present evidence rebutting the mitigating effects of the *Miller* factors.  Thus, the majority's characterization of a no-burden standard as "unworkable," *ante* at 15, is only true because of its erroneous recognition of a presumption against LWOP.  Instead, if anything is unworkable, it is the majority's new framework, which requires the prosecutor to "prove facts and circumstances that rebut the presumption against LWOP by . . . clear and convincing evidence," *ante* at 17, while still acknowledging, as it must, that neither *Miller* and *Montgomery*, on the one hand, nor MCL 769.25, on the other, require a trial court to find a particular fact before it can impose an LWOP sentence.  This will be a riddle wrapped up in an enigma for trial courts to ponder for years to come.

## V. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION

The abuse-of-discretion standard that we use to review a trial court's sentencing decision is a deferential one.[59] "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes."[60] The trial court in this case carefully considered and applied each of the *Miller* factors in a lengthy, written opinion, finding that all but the defendant's home and family environment favored sentencing defendant to LWOP. Notably, the Court of Appeals concluded that the sentencing judge did not abuse her discretion even under the heightened scrutiny required by the now-overruled opinion in *Hyatt*, which held that imposition of an LWOP sentence on a juvenile offender required appellate courts to view such "sentence[s] as inherently suspect."[61] Applying the abuse-of-discretion standard we announced in *Skinner*, I believe it was well within the range of principled outcomes for the trial court to sentence defendant to LWOP.[62]

---

[59] See *Skinner*, 502 Mich at 135-136.

[60] *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016).

[61] *Hyatt*, 316 Mich App 368.

[62] Although the majority does not directly address the trial court's application of the *Miller* factors, the concurrence levels a number of criticisms against the trial court's original application of the *Miller* factors that I believe should be addressed. With respect to the first factor, chronological age and its hallmark features, the concurrence correctly notes that a juvenile does not need to be the same age as the individuals in *Miller* in order to benefit from *Miller* and that proximity to the age of 18 can affect the extent of mitigation this factor supports. But the trial court in this case never implied that a defendant needs to be the same age as the individuals in *Miller* to benefit from that decision. Instead, the trial court did precisely what the concurrence indicates is permissible—it found "that defendant's chronological age and its hallmark features do not significantly mitigate

## VI. CONCLUSION

The breadth of the majority's holding in this case is breathtaking.  The majority first contrives a presumption against LWOP for juveniles.  In doing so, the majority deviates from prior cases declining to recognize such a presumption and ignores the intent of the Legislature.  The majority then goes even further, requiring the prosecution to rebut this presumption by clear and convincing evidence, which raises similar interpretive and separation-of-powers concerns.

---

defendant's culpability."  In other words, it relied on defendant's proximity to the age of 18 to determine the *extent* of mitigation.

Regarding the third factor, the circumstances of the offense, the concurrence contends that the trial court did not reconcile how defendant and his codefendant could both be the "truly 'rare juvenile' " discussed in *Miller* when it was only Masalmani who actually killed the victim.  But nothing in *Miller* indicates that the trial court needed to make such a reconciliation on the record, and the circumstances of the offense are just one factor for a trial court to consider in fashioning a sentence.  In any event, it is not hard for me to see how a trial judge could conclude that two individuals who participated in the brutal abduction and murder of a random victim are both incorrigible and incapable of reform despite playing different roles in the events that led to the murder.

Finally, with respect to the fifth factor, the possibility of rehabilitation, the concurrence implies that trial courts should avoid finding that a *Miller* factor is mitigating while also relying on that factor to discount the mitigation of another *Miller* factor.  See *ante* at 9-10.  What *Miller* ultimately requires is for trial courts "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  *Miller*, 567 US at 480.  Nothing in *Miller* indicates that the factors announced there were intended to be compartmentalized such that consideration of one factor cannot reduce the mitigating effect of another factor.  Rather, the factors are merely a way to ensure that trial courts "take into account the differences among defendants and crimes."  *Id*. at 480 n 8.  Sometimes the presence of one mitigating factor may lead a trial court to conclude that the defendant's possibility of rehabilitation is minimal.  Acknowledging this does not run afoul of *Miller*.  On the contrary, it adheres to *Miller*'s requirement for individualized sentencing.  See *id*. at 475.

This opinion is a brazen attempt by the majority to operationalize its policy preference and "sincere hope that . . . juvenile LWOP remains relatively rare."[63]  But lost in its quixotic vision of juvenile offenders is any recognition of the enormous cost the Court imposes on the victim's family and friends by once again requiring them to relive this tragic crime at yet another resentencing.  Nor do we offer any hope for closure some 13 years after this heinous crime was committed because the trial judge will again attempt to fashion a sentence in search of the ever-elusive blessing of today's majority.

Rather than changing how trial courts sentence juveniles facing LWOP, I would remand this case to the Court of Appeals for it to address the issue it did not address on direct appeal—whether defendant's sentence violates the Eighth Amendment and Const 1963, art 1, § 16—but I would otherwise affirm the Court of Appeals.  For these reasons, I respectfully dissent.

David F. Viviano
Brian K. Zahra
Elizabeth T. Clement

---

[63] *Ante* at 20.